UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STEPHEN J. SEEFELDT,

              Plaintiff,

                                     Case No. 20-cv-238-pp

    v.

KILOLO KIJAKAZI,

              Defendant.

## ORDER REVERSING DECISION OF THE COMMISSIONER AND REMANDING FOR REHEARING UNDER SENTENCE FOUR OF 42 U.S.C. §405(g)

This is an appeal from a denial of Title II (SSDI) benefits. The disability onset date was September 1, 2016 and the plaintiff applied for benefits on September 13, 2016. Benefits initially were denied on November 21, 2016, and were denied on reconsideration on February 15, 2017. The administrative law judge held a video hearing on August 14, 2018 (the plaintiff was in Green Bay and the ALJ was in Milwaukee); the plaintiff was represented by counsel. On November 15, 2018, the ALJ issued a decision finding that the plaintiff was not disabled and that he had the residual functional capacity to perform sedentary work with some limitations. The Appeals Council granted review on October 28, 2019; while it disagreed with the ALJ regarding one facet of his decision, it otherwise affirmed. The plaintiff's date last insured was December 31, 2020. This order reverses the Commissioner's decision and remands for rehearing.

1

## I.  The Plaintiff's History

The plaintiff was born on July 15, 1969; he was forty-nine years old as of the hearing and the ALJ's decision. He has a high school education and has past work history as a wood machinist. His last work experience was as a machinist at Manitowoc Tool and Machine. Over twenty-five years ago, the plaintiff broke his neck; he testified that some seven years prior to the 2018 hearing before the ALJ, he began having problems again. He alleged the following impairments: a herniated disc (right and left lower lumbar); lower lumbar fusion of bottom three vertebrae; spinal stimulator implant with battery pack complications; lack of mobility due to fusion; legal blindness in the right eye; and chronic neck pain due to the prior broken neck. Dkt. No. 12-4 at 3.

## II.  The ALJ's Findings

| STEP | FINDINGS |
|---|---|
| Step One: Is the plaintiff engaged in substantial gainful activity? | Plaintiff has not engaged in a substantial gainful activity since September 1, 2016. |
| Step Two: Is the impairment or combination of impairments severe—does it significantly limit the plaintiff's mental or physical ability to do basic work activities? | The plaintiff has the following severe impairments: degenerative disc disease of the lumbar and cervical spine; the plaintiff is legally blind in his right eye. 20 C.F.R. §404.1520(e).<br><br>(As the court will discuss below, the Appeals Council disagreed with the findings at step 2 and found no objective medical evidence of a visual impairment in the right eye. The Appeals Council adopted the ALJ's findings that the degenerative disc disease of the lumbar and cervical spine were |

2

|  | severe impairments and hypertension was a non-severe impairment. |
|---|---|
| Step Three: Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity?<br><br>If yes, disabled.<br>If no, move to step four. | The plaintiff does not have an impairment or combination of impairments that meets or medically equal the severity of one of the listed impairments. |
| Step Four: Does the plaintiff's residual functional capacity allow the plaintiff to perform past relevant work? | The plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. §404.1567(a) except that he can never climb ladders, ropes or scaffolds. He can occasionally climb ramps or stairs. He can occasionally stoop, kneel, crouch, and crawl. The plaintiff could never be exposed to dangerous moving machinery or unprotected heights. The plaintiff is unable to perform past relevant work. |
| Step Five: Can the plaintiff perform any other work existing in significant numbers in the national economy? | The plaintiff, who was 47 at the onset date and has a high school education, can perform jobs that exist in significant numbers in the national economy. The plaintiff can work as a as an order clerk, office helper or assembler. |

After finding the plaintiff had not engaged in substantial gainful activity since September 1, 2016, the ALJ determined that the plaintiff had a degenerative disc disease of the lumbar and cervical spine and that he was legally blind in his right eye. Dkt. No. 12-3 at 21.

3

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Id. In making that determination, the ALJ considered the back disorder under Listing 1.04 and found no documentation to support that listing. Id. at 22.

At step four, the ALJ acknowledged the plaintiff's allegations of spinal impairments and blindness in his right eye. Id. at 22. The plaintiff had stated that these limitations impacted his ability to "lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks and use his hands." Id. The ALJ included a discussion of the plaintiff's testimony about significant pain in his back and neck, as well as the numbness in his fingers and the difficulty he had gripping objects. Id. The plaintiff said he could stand for thirty to forty minutes and wash dishes for twenty minutes but that he had difficulty sitting, lifting or carrying groceries. Id. He also testified that his social activities were limited, id. at 22, that he had difficulty sleeping, id. at 23, and that his ability to drive was limited, id.

The ALJ found that the impairments could reasonably be expected to cause the alleged symptoms but that the plaintiff's statements about the "intensity, persistence and limited effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" in the decision. Id. For example, the ALJ noted that while the plaintiff testified that his ability to engage in functional activities was limited, he simultaneously said he could perform "activities of daily living such

4

as attending to his personal grooming, performing simple cooking, doing cleaning and laundry, and going shopping." Id. The ALJ noted that the plaintiff could handle his personal finances, shop for antiques, electronics and at thrift stores, could use a computer and could drive on a limited basis. Id. He also commented on the plaintiff's ability to spend time with his girlfriend and family, concluding that the plaintiff's alleged impairments "d[id] not completely curtail his social activity." Id. The ALJ concluded that the evidence did not support greater functional limitations than those the ALJ had crafted. Id.

The ALJ included a recitation of the objective evidence, specifically the past history of lumbar laminectomies with the most recent lumbar fusion in 2012 and neck surgery dating back twenty years. Id. The ALJ also discussed the medical records, which included a June 2016 diagnosis of lumbar degenerative disease and radiculopathy and the implant of a spinal cord stimulator. Id. Pain managements notes corroborated the plaintiff's reports of back and neck pain and included a diagnosis of "lumbar disc disorder, cervicalgia, cervical disc disorder, and post-laminectomy syndrome." Id. The doctor prescribed oxycodone and an epidural steroid injection and the plaintiff underwent an implant revision surgery. Id. The ALJ commented that the plaintiff's pain had improved with medication in November of 2016. Id.

The ALJ discussed lumbar x-rays in February of 2017 that showed lumbar spondylosis and post-surgical changes at the L5-S1. Id. at 24. Additional x-rays in March 2017 following a car accident showed "cervical spondylosis and foraminal narrowing, but no fractures of the shoulder or

spine." Id. The physical examination at that time showed tenderness and limited range of motion in the neck due to pain but a full range of motion and 5/5 strength. Id. The doctor diagnosed a cervical strain and administered a medial branch block. Id. The ALJ pointed out that the plaintiff reported 50% relief with pain medication and that the plaintiff declined epidural injections. Id.

The ALJ addressed the plaintiff's reports of tingling in his shoulders and fingers, commenting that the 2018 treatment notes showed strength to be 5/5 in his upper extremities. Id. A May 2018 CT scan by Dr. Horak noted "mild bilateral facet arthropathy and moderate central canal and neural foraminal narrowing in C5-6, as well as mild neural foraminal narrowing at C3-4 related to mild joint hypertrophy." Id. The plaintiff underwent a C5-6 epidural steroid injection in 2018 and the post-procedure diagnosis was cervical spinal stenosis and spondylosis. Id.

The ALJ assigned great weight to the opinions of the state agency evaluating doctors, Drs. Shaw and Byrd, who reviewed the medical file in November 2016 and on reconsideration in February 2017. Id. at 25. Both classified the impairment as a spine disorder and both found the plaintiff limited to work at the sedentary level. Id. The ALJ found their opinions to be consistent with the other evidence in the record because the imaging showed mild to moderate findings, physical exams showed no deficits in strength or gait and the plaintiff "ha[d] participated in conservative care for his conditions

6

during the relevant period that ha[d] been at least somewhat effective in controlling his pain and symptoms." Id. at 25.

The ALJ assigned little weight to Dr. Jeremy Scarlett and Christa Scheunemann, N.P.; he concluded that Scheunemann was not an acceptable medical source. Id. The ALJ concluded that Scarlett and Scheunemann's opinions lacked a function-by-function assessment and it was not clear whether they were recommending that the plaintiff remain off work as a machinist or off all work in general. Id.

To account for the limitations, the ALJ limited the plaintiff to never climbing ladders, ropes or scaffolds, occasionally climbing ramps or stairs, and occasionally stooping, kneeling, crouching and crawling. Id. at 25. To account for the right eye impairment, the ALJ limited the plaintiff to never being exposed to dangerous moving machinery or unprotected heights. Id. at 25-26. This RFC meant the plaintiff could not perform past relevant work as a machinist. Id. at 27/

Based on the plaintiff's younger age (forty-seven),[1] his high school education, ability to communicate in English and the testimony of the vocational expert, the ALJ found that the plaintiff could work as an order clerk, office helper and assembler. Id. at 27. He found that these jobs existed in significant numbers in the national economy. Id.

---

[1] This may be a typo—the plaintiff was forty-nine at the time of the hearing.

### III.    The Appeals Council's Review

The Appeals Council granted review and a two-judge panel affirmed the

ALJ's findings on all but the right eye impairment. The Appeals Council wrote:

> The representative contends that the Administrative Law Judge's finding that the plaintiff suffered 'no deterioration' since the last State agency review was not supported by substantial evidence (Exhibit 16E, page 1). The representative noted that there was additional evidence regarding the plaintiff's cervical spine impairment since the date of the prior State agency review (Exhibit 16E, page 1). However, the representative does not indicate any additional limitations imposed by the impairment not already accounted for in the residual functional capacity assessment. Review of the record shows that the residual functional capacity accounts for the limitations imposed by the plaintiff's medically determinable impairments based on the available objective evidence.

Dkt. No. 12-3 at 5.

The Appeals Council also rejected the argument that the ALJ's

discussion of the plaintiff's daily living activities was inconsistent with SSR 16-

3, noting that the representative had not suggested any specific functional

limitations that were not included in the decision. Id. Finally, the Appeals

Council rejected the plaintiff's argument that the RFC should have included

manipulative limitations. Id. The Council observed that the plaintiff's

representative had pointed to a single examination note where the plaintiff had

decreased sensation to light touch in the right middle and ring fingers. Id.

While the representative speculated that it would be related to the cervical

spine impairment, the Council found that there was no objective medical

evidence establishing the presence of manipulative limitations lasting twelve

months or longer. Id. The Appeals Council rejected the finding that the plaintiff

was legally blind in the right eye only because there was no objective medical evidence of a visual impairment. Id.

## IV. Standard of Review

This court must uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g); Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). A decision denying benefits need not discuss every piece of evidence; remand is appropriate, however, when an ALJ fails to provide adequate support for the conclusions drawn. Jelinek, 662 F.3d at 811. The ALJ must provide an "accurate and logical bridge" from the evidence to the conclusion. Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must follow the Social Security Administration's (SSA) rulings and regulations in making a determination. Failure to do so requires reversal unless the error is harmless. See Prochaska v. Barnhart, 454 F.3d 731, 736–37 (7th Cir. 2006). The court does not substitute its judgment for that of the Commissioner by "reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998). Judicial review is limited to the rationales offered by the ALJ. Shauger v. Astrue, 675 F.3d 690, 697 (7th Cir. 2012) (citing SEC v. Chenery Corp., 318 U.S. 80, 93–95 (1943)).

9

**V. Statement of Issues**

The plaintiff makes the same three arguments on appeal that he raised with the Appeals Council. First, the plaintiff argues that the ALJ erred in assigning significant weight to the opinion of the state agency physicians because those opinions preceded imaging describing abnormal findings in the cervical spine. Dkt. No. 13 at 2. The plaintiff argues that neither the ALJ nor the Appeals Council were qualified to assess that imaging without further medical input. Id. Second, he argues that the ALJ erred in evaluating his complaints of pain and other symptoms—particularly the way the ALJ evaluated his daily activities, his purported improvement with treatment and the allegedly conservative nature of treatment. Id. Third, the plaintiff asserts that the ALJ erred in failing to account for evidence of the plaintiff's difficulty with use of his fingers. Id.

**VI. The Court's Analysis**

    A.   <u>State Agency Consultant Opinion/Newer Imaging</u>

        1.   *Plaintiff's Brief*

The plaintiff first asserts that the ALJ and the Appeals Council relied on the "outdated" opinion of Dr. Byrd, a state agency consultant who found the plaintiff capable of sedentary work. He notes that the ALJ assigned great weight to Dr. Byrd's opinion; the Appeals Council gave it significant weight. Dkt. No. 13 at 9. The plaintiff says that Dr. Byrd referenced a December 2016 exam showing some loss of range of motion in the cervical spine and normal neurological findings and an x-ray showing multilevel degenerative changes. Id.

He argues, however, that a cervical spine x-ray in February 2017 and CT scans in 2018—not addressed by Dr. Byrd—showed more significant deterioration and provided a greater level of detail. Id.

Specifically, the 2017 cervical spine x-ray revealed "a quite prominent osteophytic impingement upon the left C5-6 neural foramen, milder narrowing at other levels." Id. (citing Dkt. No. 12-14 at 28).[2] Under "Impression," the doctor wrote:

> 1. Cervical spondylosis changes, especially C5-6, where there does appear to be **significant retrolisthesis** as well as underlying spondylosis with posterior osteophyte formation and disk space narrowing. Significant left C5-5 neural foraminal narrowing.
>
> 2. Abnormal appearance at C2 and C3 levels, probably a combination of old trauma and underlying congenital partial C2-3 anomaly.

Id. (emphasis added). In addition, a May 10, 2018 CT of the cervical spine without contrast noted

> C5-C6: There is a mild 2 mm retrolisthesis of C5 upon C6. Mild diffuse posterior disc and osteophyte complex and bilateral uncovertebral joint hypertrophy, left greater than right. There is resultant moderate central canal narrowing and moderate bilateral neural foraminal narrowing. Mild bilateral facet arthropathy.

Dkt. No. 12-15 at 21. Although the Appeals Council commented on the 2017 imaging, the plaintiff says it did not refer to the "significant findings" or otherwise address the May 2018 CT scan. Id. The plaintiff asserts that the ALJ

---

[2] The plaintiff's brief refers to the "more significant findings" of the cervical spine x-ray taken in February 2017, dkt. no. 13 at 9, but cites to the cervical spine x-ray taken after a motor vehicle accident in March 2017, id. at 4 (citing Dkt. No. 12-14 at 28). The February 6, 2017, lumbar spine x-ray showed post-surgical changes, L5-S1, lumbar spondylosis changes and the surgical fusion, and "moderate L5-S1 disk space narrowing." Dkt. No. 12-9 at 27,

11

(and the Appeals Council) lacked the medical expertise to interpret imaging evidence that the state agency doctors had not reviewed or opined upon. Id. at 11. The plaintiff argues that given the newer imaging, the ALJ erred in finding a lack of significant deterioration. Id. at 12-13.

The plaintiff argues that this error impacted the ALJ's consideration of the plaintiff's complaints of pain under SSR 16-3. Id. at 13. He says that if the imaging had corroborated the plaintiff's complaint of pain and if the ALJ had properly credited those complaints, the ALJ would have had to find the plaintiff disabled. Id. To the extent that the Appeals Council said it considered all limitations imposed by the impairments "based on the available objective medical evidence," id. at 13 (quoting Dkt. No. 12-3 at 5), the plaintiff argues that this statement misstates the agency policy, which requires consideration of "all relevant evidence in the case record." Id. (citing SSR 96-8p).

### 2. *Commissioner's Brief in Opposition*

The Commissioner responds that the plaintiff overstates the law—an ALJ can rely on state agency doctors even where they have not reviewed the entire record. Dkt. No. 21 at 8 (citing Keys v. Berryhill, 679 F. App'x 477, 480-81 (7th Cir. 2017)). She argues that the ALJ found that state agency Drs. Shaw and Byrd may have underestimated some postural and environmental limitations, but that he still found their opinions generally consistent with the medical evidence. Dkt. No. 21 at 9. Both doctors considered the plaintiff's neck pain and decreased range of motion; Dr. Byrd referenced a December 2016 x-ray showing "multilevel degenerative changes." Id. The Commissioner asserts that

Case 1:20-cv-00238-PP   Filed 04/29/22   Page 12 of 35   Document 26

the "new" evidence wasn't new in the sense that there was a new diagnosis or striking differences and emphasizes that the ALJ accurately noted the 2017 x-ray and the 2018 CT results. Id. at 10. The Commissioner also argues the plaintiff has made no attempt to reconcile the fact that the 2017 x-ray showed cervical issues had progressed to "significant" but that the 2018 CT scan showed only mild to moderate dysfunction. Id. at 9, n.7. Finally, the Commissioner points out that the ALJ did not consider the 2017 results in a vacuum but also summarized and reviewed the contemporaneous treatment notes. Id. at 11.

### 3.    *Plaintiff's Reply*

The plaintiff clarified that there were two errors with respect to the February 2017 cervical spine x-ray and the May 2018 cervical CT: (1) the ALJ erred because the new evidence could have reasonably changed the opinions of the state agency physicians; and (2) the ALJ erred in interpreting the spinal imaging evidence on his own without obtaining medical expert input. Dkt. No. 22 at 3. The plaintiff relies on Moreno v. Berryhill, 882, F.3d 722, 728 (7th Cir. 2018), in which the Seventh Circuit reversed based on new signs of a mental health condition that had not been before the state agency. Id. The plaintiff says that evidence the agency consultative physicians did not consider included findings of a "quite prominent osteophytic impingement upon the left C5-C6 neural foramen," "significant left C5-C6 neural foraminal narrowing" and "moderate central canal narrowing and moderate bilateral neural foraminal narrowing." Id. at 2. The plaintiff says that in light of the degree of narrowing,

the evidence is striking and more similar to Moreno than the Commissioner is willing to admit. Id. at 3. Because the imaging before Dr. Byrd did not specify the degree of foraminal narrowing, the plaintiff argues that one cannot assume the later findings would have not had an impact on the opinion. Id.

As for the second part of the error, the plaintiff says the ALJ never should have interpreted the imaging evidence on his own. Id. at 4. The plaintiff asserts that the ALJ went further than simply quoting the imaging reports and actually found that there was no evidence of significant deterioration during the relevant period; he argues that that statement required a comparison of the imaging evidence, something the ALJ was not qualified to do. Id.

4.    *Discussion*

The Seventh Circuit repeatedly has stated that an ALJ may not play doctor and "interpret new and potentially decisive medical evidence without medical scrutiny." McHenry v. Berryhill, 911 F.3d 866, 871 (7th Cir. 2018); see also Stage v. Colvin, 812 F.3d 1121 (7th Cir. 2016) (holding that an ALJ errs in accepting a reviewing doctor's opinion where the reviewer did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion."). More recently, the Seventh Circuit clarified that not all new medical evidence requires professional scrutiny beyond the assessment of an ALJ. Kemplen v. Saul, 844 F. App'x 883, 887-888 (7th Cir. 2021), as amended on reh'g in part (June 21, 2021). Nevertheless, the Kemplen court concluded that the ALJ had erred by not soliciting an updated medical opinion interpreting x-

14

rays that postdated the state agency consultant's report where the results of those x-rays were inconsistent with the ALJ's opinion. Id.

This court must decide whether the ALJ supported his opinion with substantial evidence. Not every new CT scan or MRI requires expert evaluation beyond the ALJ; however, the ALJ must demonstrate that the new evidence is insubstantial when weighed against the evidentiary record. In Akin v. Berryhill, the Seventh Circuit held that the ALJ erred in impermissibly evaluating MRI results that had not been interpreted by a physician. 887 F.3d 314, 317 (7th Cir. 2018). The court reasoned that "without an expert opinion interpreting the MRI results in the record, the ALJ was not qualified to conclude that the MRI results were 'consistent' with his assessment." Id. The court explained that

> [t]he MRI results may corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion. The ALJ had many options to avoid this error; for example, he could have sought an updated medical opinion. See Green v. Apfel, 204 F.3d 780, 782 (7th Cir. 2000). But because the ALJ impermissibly interpreted the MRI results himself, we vacate the judgment and remand this case to the agency.

Id. at 317–18.

On the other hand, courts have affirmed where the ALJ reviewed and cited to new records but did not draw any conclusions about the limitations from those records. In Schuelke v. Saul, No. 18-CV-833-JDP, 2019 WL 2514825, at *2 (W.D. Wis. June 18, 2019), Chief Judge James Peterson affirmed the ALJ where the record citations showed that the ALJ was "not looking at the raw images and test results and analyzing them himself," but rather was relying on analyses offered by plaintiff's treating physicians.

15

Similarly, in Pate v. Kijakazi, No. 20-cv-942-bbc, 2022 WL795472, *4 (7th Cir. Mar. 16, 2022), Judge Barbara Crabb "was not persuaded" that the ALJ had drawn conclusions about the plaintiff's limitations from an MRI or medical imaging. She concluded that the ALJ simply had acknowledged the medical imaging confirming that the "cervical, thoracic and lumbar degenerative disease" persisted despite surgeries, but noted that the plaintiff's actual functioning during physical examinations was not entirely consistent with his allegations of total disability. Id.

This issue arises repeatedly because there will always be a lag between a state agency physician's review and an ALJ's decision. Plaintiffs typically continue to seek treatment; in this case, the plaintiff had an x-ray on February 6, 2017 and a CT cervical scan after a car accident on March 22, 2017. Dkt. No. 12-14 at 28. The ALJ discussed the imaging, as well as a March 2018 CT scan, summarizing it as follows:

> The plaintiff underwent lumbar x-rays in February 2017 that showed lumbar spondylosis, and post-surgical changes at L5-S1 (Ex. 5F). In March 2017, the plaintiff was involved in a motor vehicle accident. X-rays showed cervical spondylosis and foraminal narrowing, but no fractures of the shoulder or spine. During physical exam, the plaintiff's neck range of motion was limited due to pain, but he exhibited no posterior cervical pain or tenderness. His right shoulder exhibited tenderness, but his shoulder had full range of motion and 5/5 strength. The plaintiff was diagnosed with cervical strain. He was given a cervical medial branch block (Ex. 11F/12-14; was diagnosed with cervical strain. He was given a cervical medial branch block (Ex. 11F/12-14; Ex. 12 F/9). Subsequently, the plaintiff reported neck pain that was aggravated by standing, sitting and walking. However, he reported that he obtained 50% relief with pain medication. The notes show that the plaintiff was offered epidural injections for his pain, but the plaintiff declined injections or any other non-opioid treatments at that time (Ex. 12F/4-5).

Dkt. No. 12-3 at 24. The ALJ summarized the May 2018 CT scan by referencing Dr. Horak's notes: "the CT scan revealed mild bilateral facet arthropathy and moderate central canal and neural foraminal narrowing in C5-6, as well as mild neural foraminal narrowing at C3-4 related to mild joint hypertrophy (Ex. 14F/5). Id. The ALJ found the record showed "no significant deterioration in the plaintiff's condition during the relevant period." Dkt. No. 12-3 at 25. He then assigned great weight to the state agency opinions of Drs. Shaw (November 2016) and Byrd (February 2017) after concluding that their findings and opinions were consistent with the other evidence in the record. Id. at 25. The ALJ explained:

> As discussed above, imaging of the plaintiff's spine has shown no more than mild to moderate findings, physical exams have not shown deficits in strength, gait or station and the plaintiff has participated in conservative care for his conditions during the relevant period that have been at least somewhat effective in controlling his pain and symptoms.

Dkt. No. 12-3 at 25.

The opinions of Drs. Shaw and Byrd make clear that they did not consider any of these later findings. Both opinions preceded the March 2017 and 2018 CT scans. Dr. Shaw noted post-surgical changes in L5-S1, lumbar spondylosis changes, especially at the surgical fusion level with no acute abnormality noted, and multilevel degenerative changes. Dkt. No. 12-4 at 3-10, 15. What is troubling is the ALJ's statement that the imaging was consistent with the state agency opinions and supported the RFC because the imaging had shown no more than "mild to moderate findings." Dkt. No. 12-3 at 25.

17

While the imaging did not necessarily reveal a new condition, it arguably identified a *worsening* condition when the March 2017 imaging identified a "prominent osteophytic impingement" and "significant retrolisthesis as well as underlying spondylosis with posterior osteophyte formation and disk space narrowing." Dkt. No. 12-14 at 28. The 2018 imaging identified 2 mm retrolisthesis of C5 upon 6 and "moderate canal narrowing and moderate bilateral neural foraminal narrowing." Dkt. No. 12-15 at 21. The ALJ did not include this language in his summary or otherwise explain why a "prominent impingement" or "significant retrolisthesis" amounted to no more than a mild to moderate finding. Perhaps a physician would not consider the 2 mm retrolisthesis found in the later imaging significant, but the ALJ did not have a doctor's view on that question, and neither he nor this court have the medical expertise to make that determination, or to say how a doctor's view of the imaging might have impacted the ALJ's formulation of the RFC.

Other district courts have remanded where the state agency consultants reviewed imaging showing mild degenerative disc disease but a subsequent MRI showed evidence of nerve root impingement or compression. Shirley v. Kijakazi, No. 1:20-cv-01270-TAB-JPH, 2021 WL 2980398, *5 (S.D. Ind. July 15, 2021). Similarly, a district court found error when the ALJ reviewed updated medical evidence showing "moderate to severe foraminal stenosis with impingement of the spinal cord" but did not seek expert guidance from an expert. Terri R. v. Berryhill, No. 2:17-cv-465-WTL-MJD, 2018 WL 4443002, *6 (S.D. Ind. Sept. 18, 2018). Last month, a district court remanded to allow the

ALJ to reassess the medical evidence and opinions and to obtain the opinion of a medical expert to review a more recent MRI that demonstrated an impingement of nerve roots and L5 radiculopathy. Anthony C. v. Kijakazi, No. 2:21cv8, 2022 WL 683207, *7 (N.D. Ind. Mar. 7, 2022).

The court is not holding that the new imaging requires a finding of disability. Remand is necessary because it appears the ALJ didn't consider the "prominent impingement" or "significant retrolisthesis." He concluded that the imaging showed mild to moderate findings, but there is no medical evidence to allow this court to determine whether that conclusion is supported by substantial evidence. The same is true of the ALJ's conclusion that there was no deterioration. These findings require conclusions and comparisons that the ALJ does not appear to have been qualified to make. And the court agrees with the plaintiff that an error in this assessment could have tainted the ALJ's analysis of the plaintiff's reported pain symptoms and the resulting RFC.

B.    SSR 16-3p

1.    *Plaintiff's Brief*

The plaintiff next attacks the ALJ's assessment under SSR 16-3p because the ALJ found the plaintiff's statements about his symptoms "not entirely consistent" with the medical and other evidence. The plaintiff says the ALJ erred in his reliance on daily activities, an overstated claim of improvement with medication and the purportedly conservative nature of the plaintiff's treatment. Dkt. No. 13 at 14. With respect to daily activities, the plaintiff asserts that the ALJ simply recited a list of functional activities, then said that

19

the list demonstrated that "[the plaintiff's] impairments do not completely curtail his social activity." Id. at 15. The plaintiff argues that not only was the analysis cursory, but the ALJ ignored his variable functioning and the qualification on his ability to perform daily activities. Id. at 16. For example, the ALJ said that the plaintiff could still play on the computer when the plaintiff really said that he could play games for 10-15 minutes and "can't look at the computer because [he] can't look down." Id. at 17 (citing Dkt. No. 12-3 at 23, 45). The ALJ also failed to mention that the plaintiff had trouble typing on the computer because of the numbness in his hands. Id. (citing Dkt. No. 45-46). The ALJ said that the plaintiff could spend time with his girlfriend and family, "this demonstrating that his impairments do not completely curtail his social activity," dkt. no. 13 at 17; the plaintiff points out that he never alleged that his impairments compromised his ability to spend time with family.

In terms of improvement in spinal symptoms, the ALJ found that treatment had reduced or eliminated the plaintiff's pain, but the plaintiff asserts that there is no evidence that the pain had been eliminated. Id. at 18. The plaintiff argues that the ALJ omitted the details of improvement: a November 2016 report reflected that with medications, there was temporary improvement since the last visit (approximately a 5% improvement). Id. at 18. Similarly, an April 2017 record showed 50% relief with pain medication, but the ALJ did not acknowledge that the relief was temporary and that the plaintiff had received a branch block a month earlier. Id. at 19 (citing Dkt. No.

12-4 at 43, 48). In that same record, the plaintiff denied that he had any improvement with activities of daily living. Id.

Finally, the plaintiff points out that the ALJ discounted the plaintiff's descriptions of his symptoms because he performed significant functional activities of daily living despite a "relatively conservative course of treatment, in particular through the use of medications, with the record showing no recent surgeries." Id. at (citing Dkt. No. 12-3 at 24). The plaintiff asserts that this ignores his history of surgeries with no improvement and a low back diagnosis that includes lumbar postlaminectomy syndrome. Id. at 20 (citing Dkt. Nos. 12-8 at 3, 6, 12, 46, 60, 62; 12-11 at 40, 48; 12-14 at 48, 70, 75). Dr. Scarlett performed the spinal cord implant in June 2016 and the revised procedure in October 2016. Id. at 20 (citing 12-14 at 70). The plaintiff asserts that the ALJ implied that there was something further that could have been done to manage the plaintiff's pain; the plaintiff argues that the ALJ was not medically qualified to conclude that there were other options for treating his pain aside from surgery, a spinal cord stimulator and revision, medial branch blocs and epidural steroids. Id. at 20. The plaintiff points out that he also required "heavy narcotic pain medications, including morphine (MS Contin), from 2015-2016." Id. The plaintiff argues that viewed as a whole, this cannot be characterized as a "conservative" course of treatment. Id. at 21.

2. *Commissioner's Brief*

The Commissioner argues that the plaintiff has failed to identify harmful error. Dkt. No. 21 at 16. She asserts that the ALJ rejected the plaintiff's claims,

in part, based on a lack of objective evidence and the plaintiff's treatment, activities and medical opinions. According to the Commissioner, the plaintiff has taken his logical bridge argument too far—the court does not separately examine each finding but rather looks to the decision as a whole. Id. at 17. The Commissioner asserts that here, the path was clear and the reliance on the activities of daily living was reasonable. Id. She emphasizes that the ALJ did not equate the activities of daily living with a conclusion that the plaintiff could engage in full-time work or that the plaintiff could perform the activities on a daily, sustained basis. Id. She says that the ALJ cited the activities in connection with his determination that the plaintiff's subjective reports of his symptoms weren't fully supported by the record. Id. at 18. With respect to the ALJ's observation that medicine reduced the plaintiff's pain, the Commissioner asserts that the ALJ properly referenced a November 2016 report indicating that pain improved with medication and an April 2017 report that he experienced 50% pain relief with treatment. Id. at 20.

The Commissioner addresses the plaintiff's arguments that the ALJ cherry-picked the evidence. She says that while the plaintiff reported 5% pain relief during the November 2016 examination, he also said it led to improvements of daily living. Id. at 21. She concedes that the plaintiff's report of 50% pain relief may have been temporary, but argues that the ALJ never said that the relief was permanent. Id. As for the plaintiff's argument that the ALJ should not have characterized the plaintiff's treatment as "conservative," the Commissioner notes that the ALJ acknowledged the prior spinal surgeries

22

and the spinal cord implant revision surgery in November 2016. Id. She asserts that the plaintiff had no other surgeries before the alleged onset date. Id. The Commissioner points out that the Seventh Circuit has recognized that epidural steroid injections are conservative forms of treatment. Id. at 22 (citing Olsen v. Colvin, 551 F. App'x 868, 875 (7th Cir. 2014). And the Commissioner argues that any mischaracterization was harmless because the plaintiff did report reduction in pain. Id.

### 3. *Plaintiff's Reply*

The plaintiff replies that in this circuit, an ALJ must explain why the daily activities are inconsistent with the plaintiff's allegations. Dkt. No. 22 at 5 (citing Cullinan v. Berryhill, 878 F.3d 598, 604-605 (7th Cir. 2017). He asserts that the ALJ completely ignored that the plaintiff said that he only shops on his good days. Id. at 6 (Dkt. No. 12-3 at 22). While the Commissioner cited to the plaintiff's personal grooming as inconsistent with the allegations that he had difficulty using his hands, the plaintiff says that this was impermissible *post hoc* reasoning. Id. He argues that the ALJ ignored the facts that the plaintiff reported that he only performed hobby activities on good days and household activities when he was feeling well, and that he varied his activities based on pain level. Id. The plaintiff asserts that the ALJ merely equated the plaintiff's list of activities with the ability to work and argues that that is something an ALJ cannot do when assessing credibility.

As for the plaintiff's treatment, the plaintiff accuses the ALJ of concealing and overstating the degree of improvement by selectively citing to the record.

Id. at 9. He says that the ALJ omitted references to the record where the notes showed no improvement. Id. (citing Dkt. No. 12-14 at 57). The plaintiff observes that although the ALJ said no "recent surgeries," the plaintiff had had surgery and had suffered postlaminectomy syndrome. Id. at 10. The plaintiff argues that it is not simply that the ALJ labeled the treatment as conservative but that he drew an adverse inference based on a lack of recent surgeries. Id. at 11.

      4.    *Discussion*

SSR 16-3p describes a two-step process for evaluating a plaintiff's subjective symptoms: (1) the ALJ must determine whether the plaintiff has a "medically determinable impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain"; and (2) the ALJ must evaluate the "intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p. A court will overturn an ALJ's evaluation of a plaintiff's subjective symptom allegations only if it is "patently wrong." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019).

The plaintiff takes issue with the ALJ's discussion at step two of the Rule 16-3 analysis. The ALJ must consider the plaintiff's subjective symptom allegations in light of the plaintiff's daily activities; the location, duration, frequency, and intensity of pain and limiting effects of other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain. 20 C.F.R. §404.1529(c)(3). While the ALJ

24

can consider daily activities, he cannot disregard a plaintiff's limitations in performing the activities. Meuser v. Colvin, 848 F.3d 905, 913 (7th Cir. 2016). The ALJ also has "an obligation to consider all relevant medical evidence and cannot cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010); see also Yurt v. Colvin, 758 F.3d 850, 859 (7th Cir. 2014) (ALJ impermissibly cherry-picked evaluation based on highest functioning score when plaintiff had lower score two weeks later).

The ALJ discussed the relevant factors as required. The question is whether his analysis is supported by substantial evidence. The ALJ's discussion of daily activities appears on page 22 of his decision:

> The plaintiff alleges that due to multiple impairments and limitations, his ability is limited in performing such functional activities as lifting, squatting, bending standing, reaching walking, sitting, kneeling, climbing stairs, completing tasks and using his hands (Ex. 5E; Hearing Testimony). Nonetheless, he reports that he can still perform activities of daily living such as attending to his personal grooming, performing simple cooking, doing cleaning and laundry, and going shopping. The plaintiff also handles his personal finances such as paying bills, counting change, handling a savings account, and using a checkbook. He can engage in personal hobbies such as shopping for antiques, electronics, and at thrift stores (Ex. 5E). He is still able to use a computer, and can drive on a limited basis (Hearing Testimony). The plaintiff is also able to spend time with his girlfriend and family, thus demonstrating that his impairments do not completely curtail his social activity (Ex. 5E; Hearing Testimony). Overall, the record as a whole reflects that the plaintiff retains a significant functional capacity. The plaintiff's reports as to the severity of the medical condition are not entirely consistent with the record as a whole. The evidence of record does not support greater functional limitations than those assessed in the RFC given herein.

Dt. No 12-3 at 23.

The ALJ listed the activities in the plaintiff's function report without mentioning the limitations on those activities as explained by the plaintiff. For example, the plaintiff said he could clean and do laundry but that the time that it took to do these activities depended on his pain level. Dkt. No. 12-7 at 28. He said he could shop for groceries, clothes or electronics for "short times." Id. at 29. He said he could watch TV and shop for antiques, electronics or thrift items on "good days." Dkt. No. 12-7 at 30. He said that his girlfriend assisted with shopping and errands. Dkt. No. 12-3 at 48. He explained on the form that back pain limited his activities and neck pain caused his hands to go numb. Id. at 31. He said that he can sit for only two hours, stand for one hour and walk for thirty minutes. Id. at 34. In the hearing, the plaintiff testified that he could drive a car "briefly" but not for long periods and that he couldn't really turn. Dkt. No. 12-3 at 45. The plaintiff said he couldn't look down at the computer because the pain [shot] right into the knot of his neck. Id. He explained that the numbness in his fingers made it hard to use the keyboard because he hit the wrong keys. Id. at 46. The ALJ did not mention any of these limitations in his opinion.

Although the ALJ did not equate the plaintiff's ability to engage in these daily activities with the ability to do full-time work, the ALJ similarly omitted qualifiers when addressing medications and treatment. For example, the ALJ said the plaintiff had "improvements" with medication in November 2016 but failed to mention that it was only a 5% improvement. Dkt. No. 12-3 at 23. The actual treatment record states:

The patient's chief complaint is neck and low back pain. Patient describes his neck and low back pain as sharp, aching and dull. Patient reports that the pain score at best is 3/10, at worst 8/10 and currently is 4/10. Pain is aggravated by standing, lifting and walking. Pain gets better by laying down, ice and medication. He has numbness in his fingertips. He states he has night pain. The patient reports no weakness, no bladder incontinence, no bowel incontinence, no sexual dysfunction, no fever/chills/ no unexplained weight loss. The pain interferes with daily activities, work, sleep. The pain makes the patient feel depressed, angry, frustrated, helpless/hopeless.

Since the last visit, the initial pain has improved temporarily. The patient states 5% relief. Patient denies any new type of pain since the last visit. He is not on any blood thinners at this point in time. With the current medication, he admits to improvement in activities of daily living. The patient denies any diagnostic tests since the last visit.

Dkt. No. 12-3 at 23.

Later in the opinion, the ALJ reported that the plaintiff had obtained 50% relief with pain medication and had declined epidural injections. Dkt. No. 12-3 at 24. That statement also requires additional context. In a visit dated April 17, 2017, the plaintiff presented with neck pain that was a 6/10. He said the initial pain had improved "temporarily" and that he had experienced 50% relief since the last visit. Dkt. No. 12-14 at 43. The ALJ did not include the plaintiff's statement that even with the current medication, he had no improvement in activities of daily living. Id. The ALJ's summary also failed to discuss the fact that on March 14, 2017—about a month before the April 7, 2017 visit—the plaintiff had received a medial branch block of the cervical nerve, dkt. no. 12-14 at 48, and had reported that the relief from that procedure was temporary, dkt. no. 12-14 at 43. At an appointment the month before the medial branch block, the plaintiff reported a deterioration of pain and no improvement in

27

activities of daily living. Dkt. No. 12-14 at 57. So while the ALJ's statement that the records contained evidence that the plaintiff had experienced improvement with medication was accurate as far as it went, it was far from complete and failed to address the temporary nature of the relief the plaintiff received from these treatments.

Finally, the ALJ found that the plaintiff was "capable of performing significant functional activities of daily living by pursuing a relatively conservative course of treatment, in particular through the use of medications, with the record showing no recent surgeries, and no significant deterioration in the plaintiff's condition during the relevant period." Dkt. No. 12-3. The plaintiff's "conservative" treatment history included prior surgeries (two lumbar laminectomies and a 2012 lumbar fusion), medial branch blocks of the cervical nerve (April 23, 2014 and March 14, 2017), a spinal cord stimulator battery revision adjustment (Oct. 26, 2016), epidural steroid injections (June 10, 2014; July 22, 2014; October 31, 2014; August 22, 2016), permanent placement of the spinal cord stimulator (January 29, 2016), a sacroiliac joint injection (June 19, 2015) and tripper point injections (January 2015). Dkt. No. 12-14 at 51. It also included opioids (morphine and hydrocodone) and non-opioids. Id. The notes from a February 20, 2017 visit to Advanced Pain Management indicate that the plaintiff had "failed a variety of conservative therapeutic interventions" for the neck pain. Dkt. No. 12-14 at 58.

The court is mindful that it must defer to the ALJ's subjective symptoms findings if they are not patently wrong; but the ALJ did not adequately address

the limitations on the activities of daily living or the limited "improvement" resulting from treatment and did not explain how those limitations are inconsistent with the other evidence in the record. Nor has he explained how he reached the conclusion that the plaintiff's course of treatment was "conservative." On remand, the ALJ must address the limitations the plaintiff described for the activities of daily living, the limited nature of the relief the plaintiff experienced with medication and other treatments and his conclusion that the plaintiff has managed with a "conservative" course of treatment.

### C.   Failure to Properly Analyze Manipulative Limitations

#### 1.   *Plaintiff's Brief*

Finally, the plaintiff argues that the ALJ and Appeals Council failed to properly consider his manipulative limitations. Dkt. No. 13 at 21. He argues that he often reported numbness in his fingers. Id. (citing Dkt. Nos. 12-3 at 45; 12-8 at 5, 8, 11, 14, 23, 26, 32, 36, 39, 45, 51, 54, 58, 65, 69; 12-14 at 57, 63, 68; 12-15 at 3). He points to an April 2018 exam that confirmed decreased sensation to light touch in his right middle and ring finger from the distal interphalangeal joint down, id. (Dkt. No. 12-15 at 4), and cervical imaging findings showed abnormalities at C5-C6, id. (citing Dkt. No. 12-15 at 21). He points out that there is no discussion about manipulative limitations in the ALJ's decision, and that the Appeals Council simply said that there needed to be objective evidence that the limitations had lasted or were expected to last twelve months. Id. at 22. The plaintiff maintains that the first question should have been whether the cervical degenerative disk disease could reasonably be

expected to produce the numbness (citing SSR 16-3p) and if so, whether the plaintiff's statements regarding the symptom and its limiting effects were consistent with the objective and other evidence. Id. at 23. The plaintiff argues that there is a need for further evaluation of the imaging evidence by a medical expert. Id. at 23. The plaintiff asserts that this error was prejudicial because the VE identified three jobs that require frequent or constant fingering. Id. at 23-24. He argues that if the symptoms precluded him from fingering on a frequent basis, all of the jobs would be eliminated. Id. at 24.

> 2. *Commissioner's Brief*

The Commissioner responds that the plaintiff has failed to show that manipulative limitations were warranted, asserting that the plaintiff relies on little more than his own lay opinion. Dkt. No. 21 at 11. She argues that both Drs. Shaw and Byrd reviewed the records regarding finger numbness and concluded that manipulative restrictions were not warranted. Id. (citing Dkt. Nos. 12-3 at 25; 12-4 at 7, 18). She asserts that the record contains only a single treatment record from April 2018 documenting decreased sensation to light touch in just two of the plaintiff's fingers on the right hand. Id. at 12. The Commissioner says that the plaintiff has not shown how the decreased sensation to light touch in portions of just two fingers obligated the ALJ to incorporate a restriction on fingering. Id. at 12. She says that even the Appeals Council observed that the assertion that the numbness stemmed from the plaintiff's cervical issues was speculative and unsupported. Id. at 13. Finally, the Commissioner argues that the plaintiff has not demonstrated that the

finger numbness would not be sufficiently accommodated by a limitation to only frequent fingering. Id. at 14. She points out that the plaintiff said that he was able to attend to his personal grooming, prepare simple meals, clean and do laundry, shop and drive on a limited basis. Id. at 16. The Commissioner also pointed to the ALJ's discussion of symptoms that improved with medication and the plaintiff's rejection of recommended treatment such as injections and non-opioid medications. Id. (citing R. 320, 655-56).

        3.    *Plaintiff's Reply*

The plaintiff clarifies that the error at this step was threefold: (1) there was no consideration for whether the evidence supported the alleged manipulative limitations as required by SSR 96-8p; (2) the ALJ failed to evaluate the symptoms under SSR 16-3p; and (3) the Appeals Council improperly discounted the symptoms on a durational basis. Dkt. No. 22 at 12. According to the plaintiff, the ALJ may decide the case on objective evidence but cannot draw a negative inference where there is no obligation to produce opinion evidence. Id. at 13 (citing 20 C.F.R. §404.953). The plaintiff maintains that the ALJ had to consider whether the evidence was consistent with his statements regarding symptoms. Id. He asserts that the ALJ never discussed the manipulative limitations in connection with the state agency opinions and drew no connection between the limitations and his personal care. Id. at 14. Finally, the plaintiff says there is no twelve month durational requirement for symptoms. Id. The correct framework was to consider whether there was an impairment that was reasonably likely to cause the symptoms; the plaintiff

says the ALJ did not consider that here. Id. The plaintiff says this error was harmful because if he was capable of only occasional fingering, there would be no sedentary jobs available for him. Id. at 15. The plaintiff argues that the ALJ should have "considered the reported symptoms of manipulative difficulties in light of the impairment of cervical degenerative disc disease and explain how the symptoms were evaluated under SSR 16-3p and how the RFC limitations were determined under SSR 96-8p." Id.

      4.   *Discussion*

An ALJ must craft the RFC mindful of all limitations because the RFC needs to reflect the most that a plaintiff can do despite his limitations. 20 C.F.R. §404.1545(a). The ALJ must consider all relevant evidence in the claim file at the time he makes the decision, including the objective medical evidence, medical source opinions and observations and a plaintiff's own statements about his limitations. SSR 96-8p. Although the ALJ is responsible for assessing a plaintiff's RFC, the plaintiff has the burden of showing how his impairments limit his functioning. See 20 C.F.R. §404.1512(a)(1). "A claimant who does not 'identify medical evidence that would justify further restrictions' is not entitled to remand." Sosh v. Saul, 818 F. App'x 542, 546 (7th Cir. 2020) (quoting Loveless v. Colvin, 810 F.3d 502, 508 (7th Cir. 2016)).

The record shows that the plaintiff repeatedly complained to doctors of numbness in his fingers, particularly in the right hand. Even prior to the alleged onset date, the plaintiff repeatedly told doctors that he was experiencing numbness in his fingertips. Dkt. No. 12-8 at 5, 8, 11, 14, 23, 26,

32

29, 36, 45, 54, 65. These complaints continued after the disability onset date. Dkt. Nos. 12-8 at 69, 78; 12-14 at 43, 65. On February 20, 2017, Dr. Roman Ekaterina diagnosed the plaintiff with "cervical disc, degeneration, mid cervical region; cervical disc disorder w radiculopathy, mid-cervical region . . . ." Dkt. No. 12-14 at 60. A physical exam on April 2, 2018, revealed that the plaintiff had

> [p]ain with palpation of cervical spine from C6-T3. Additional pain with palpation across shoulders. Limited ROM with lateral neck bending and rotation of neck. Strength of upper extremities 5/5 bilaterally. Decreased sensation to light touch of right middle and ring finger from DIP joint down. Phalen test negative.

Dkt. No. 12-15 at 4. The plaintiff testified about how the numbness impacted his functioning, particularly with respect to his ability to hold a pencil or use the keyboard.

The ALJ mentioned only that the 2018 treatment notes showed that the plaintiff had experienced "tingling in his shoulders and fingers." Dkt. No. 12-3 at 24. The Commissioner argues that the ALJ had no obligation to consider the numbness because there is only one medical record, the plaintiff has pointed to "no medical opinion indicating that his finger numbness resulted in manipulative limitations," dkt. no. 21 at 11, and "it is lay speculation that the finger numbness [was] related to cervical spine impairment," id. at 13. The law does not place the burden entirely on the plaintiff. The Seventh Circuit clarified in Kemplen that the burden is on the plaintiff to produce evidence, but not necessarily opinions. Kemplen, 844 F. App'x. at 888.

Case 1:20-cv-00238-PP   Filed 04/29/22   Page 33 of 35   Document 26

Nevertheless, the court agrees with the Appeals Council that the record is silent as to the source of finger numbness and the extent to which it had a limiting effect on the plaintiff's manipulative abilities. While the court would not remand on this issue alone, there is a possibility that on remand, a medical expert reviewing the 2017 and 2018 imaging may find that the impingement or retrolisthesis referenced in the CT scans (or the radiculopathy mentioned as a diagnosis in the records) could have some relationship to the finger numbness. If there is a medical basis for finger numbness, or a basis for the ALJ to revisit the credibility assessment, it could impact the ALJ's analysis of the plaintiff's RFC at step four. On remand, the court urges the ALJ to consider how a medical review of the 2017 and 2018 imaging and any reconsideration of the assessment of the plaintiff's subjective descriptions of his symptoms impact the ALJ's analysis of whether the RFC should include restrictions on manipulation.

## VII. Conclusion

The court **REVERSES** the decision of the Commissioner of Social Security.

The court **REMANDS** the case for rehearing under Sentence Four of 42 U.S.C. §405(g). On remand, the ALJ must obtain a medical review of the 2017 and 2018 CT scans, must consider all of the SSR 16-3p factors (including the plaintiff's limitations on activities of daily living, the temporary nature of the relief provided by medication and other treatment and the question of whether the plaintiff's course of treatment is correctly characterized as "conservative) and, if the medical review or the consideration of all the SSR16-3p factors

34

warrant it, must consider whether the plaintiff has any manipulative limitations that impact the step four RFC analysis.

Dated in Milwaukee, Wisconsin this 29th day of April, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Court**